Mr. Jarvis, good morning. I am less brave than Your Honor. I will just call my client KLI since I can't even come as close to you as I can. That's how it's in my bench memos. Good morning, and may it please the Court. My name is Jeff Jarvis. I'm with Kessler Topaz, and I'm here on behalf of KLI and the putative class. This is a case where the court below, Judge Marrero, made a number of critical . . . I think because the facts at least are . . . there are many facts, if not complicated, there are a number of them. At some point, to take . . . if you would take a statement that you're alleging is actionable and explain how it is a false statement of fact by the person who made it, and how it isn't . . . which is sort of the same thing, but how it is not . . . how it is an actionable opinion, and kind of do . . . if you do one and work it through, at some point, that might help explain rather than doing it laterally and say, well, here are the three prongs and two prongs within the three prongs. Sure. Just a suggestion. No. Well, I take Your Honor's suggestion as writ. So I will begin . . . I was going to talk about the procedural aspects. I will put that off until later, and we'll talk about . . . no, no, I think that that's a perfectly fine way to approach. So, let's start with the beginning, which is the UTC, or UTX, depending on whether you go with the initials or the ticker symbol, issued guidance in December, early December 2014, and it had certain earnings per share rates and expected profits, all that. That is a prototypical opinion statement. Not arguing in any way otherwise. But . . . and we're arguing that that particular statement, and I'll speak to a second just because I think there's sort of a fall in two groups, one sort of the . . . what I would call the guidance statements up through June of 2015 and then the June 2015 statement. So they issued guidance, and it's a prototypical opinion statement, no argument. Under Omnicare, that prototypical statement can be false because it omits material information that is necessary to make the statement true. And that's what we're alleging. We're alleging an omissions case with respect to the guidance statement. And what are we alleging with respect to the guidance statement? We are alleging that it was false because although they put the guidance out and they said . . . Who? Is this a particular person who put it out that you're . . . The company did. I think on the conference call, the CEO, Mr. Hayes, spoke to it. I think some of the other officers spoke to it as well. But it's primarily, you know, they put out a press release with guidance, they have an earnings conference call, they talk about it, those things. I mean, for example, I think it was Mr. Hayes that said, you know, this is challenging. I'm sure Mr. Savitt will go into that in some detail. But what didn't they tell the investors? And these are things we learned, albeit after the class period, but which are confirmed by things they knew at the time. So it's not what you would call a, you know, post hoc rationalization case or anything like that. It's information they knew that we confirmed with after the . . . in part with after the past period statements. And so what did they say after the class period? Hold on a second. I'm having trouble hearing the words. Maybe if you raise . . . If you raise the . . . Raise . . . Yes, I'm sorry. If you press the button, you can raise the . . . Oh. Yeah. Only . . . Oh. Only high school students who argue in moot courts here immediately know how to work that. The tech is daunting to me. What can I say, Your Honor? So why is a pure guidance statement false? Because they didn't tell investors things that investors needed to know. I mean, typically guidance is generated, work it up from the bottom, bubbles up, the information from the bottom of the company is taken up by the senior executives who do their thing and put in the guidance. What did Mr. Hayes tell us in July of 2015? He said, one, that the key guides, which dealt with the aerospace division and particularly what they call the aftermarket services, slash parts, slash all sorts of things dealing with their servicing of airplanes primarily, what you call commercial jets. He told us that we forced or we pushed that guidance down on the people for $300 million. We did it without any significant basis. This is something they had done prior. It's not what he's saying now. He's saying . . . What he's saying they had done. Exactly. He's saying in July, back when we gave you that guidance in December, we didn't tell you then. But by the way, we pushed it down on the aerospace guys, his terminology, or the aerospace systems guys. He said it was without basis or without substantial basis. We didn't delve deeply enough into the various and sundry pieces of it. He's saying they made a mistake. Is that the same thing as a deliberate . . . No, I don't think that's what he's saying, Your Honor. A mistake, obviously, is maybe negligent, but it's certainly not actionable fraud. I think what he didn't tell us is, and I think it's relevant to an investor, is that this guidance isn't bottom-up. It's top-down. We, the senior executives of this company, are imposing it. We're giving it down to people. That's the first thing he told them. He also said, what was their basis for it? Well, all we did was assume that the trends that had been going forward would continue to go forward. That is not, obviously, in itself unreasonable or fraudulent . . . Who is this person who is making these statements? It's Mr. Hayes, primarily, and Mr. Jahiri makes some of them as well. His title? What? His title? Mr. Hayes was the CEO. Mr. Jahiri was the CFO beginning in January of 2015. So that's the first piece of it. Mr. Hayes is up there admitting. He's not just saying, oh, gee, on retrospective, as how the district court judge saw it, he said, oh, yeah, they're just sort of admitting post hoc what they learned at the end of it. No. Mr. Hayes is giving you, and us, the investors, at that point in time, specific facts. We pushed it down. We based it solely on an expectation of continuation of prior trends. What does the complaint tell you about what they knew in December? What the complaint says, and it comes from a number of what we call former . . . Maybe I don't know. I don't . . . We're dealing with two statements here. One statement is the statement, what in July, and then the other one is, I'm sure if I take up a lot of time, the presider might make up for my doing that with your time, right? The presider will. Thank you. We'll have a discussion, a fulsome discussion about that. Fulsome is the right word, but anyhow, the . . . I'm trying to . . . It's one thing to an opinion or a fact, but that's mixed in with what he's saying about, well, what he said in December, right? The question is, are you focusing on both or are you focusing on either? The statement in December is what we allege to be false. The statement in July is what they call in the parlance a corrective disclosure, the truth has come out. What he's explaining is not just that, oh, gee . . . But you're not saying that what he's saying in July is wrong. You're saying what he said in July makes it clear that what he said in December was a false misleading with knowledge, with . . . Yes, Your Honor, exactly what I'm saying. Yes, but at the same time, Mr. Hayes said, the very quotation you're using, Hayes said, at the end of the day, it turned out that this was not accurate. What that means is, at the end of the day, we look back and find out we shouldn't have done that. In terms of pushing down, I mean, that's what managers are supposed to do, isn't it? Tell people this is the goal. The people at the top make the goals and the people below are supposed to scramble to realize this. I do understand that, and that would not be the case, but what he's saying is we pushed down a particular goal, 300 million on the aerospace guidance, and he says, if you look at the opening of that statement, he put in . . . May I continue? Yes. He said, you know, he gave some reasons for what he said, but he said the real reason that we missed our guidance at the end, this is the July statement, is that we pushed it down on the aerospace guys, $300 million. We didn't have a good basis for it. He says later that we only did it based on trends, but what he knew, and I'd like to let the FDs tell us about what they knew, was that they had no real basis to believe that those trends would continue. Mr. Gitlin, another of the defendants, had received guidance from below saying that, look, high upper single-digit growth isn't happening, it's going to be at best mid-single-digit. How would they know whether trends are going to continue? You know, Yogi Berra said it's hard to make predictions, especially about the future. The wisdom of Mr. Berra is not to be denied, but I think because, I mean, let's just fix one of them. They said at the end, which is what our FDs were saying at the beginning, is 787 provisioning was going to be a major driver. They thought it was going to be up, I believe, a little bit, and it ended up being down 40%. Well, the FDs are telling them, and this is, you know, we argue common knowledge effectively within the aerospace division of the company, that 787 had sort of gone through its first phase and that just wasn't going to continue. They knew that fact, we allege, going in. We don't have full discovery, but we have, I think, a good faith basis for alleging that. At the end, and if you look at Mr. Savage's brief in pages, I think, 18 and 19, they explain what they ultimately said the causes were. That was one of the biggest causes. In other words, facts that they knew coming in in December. So he admits those facts at the end. We say he knew them at the front, and he also admits we forced it down just looking at trends without taking advantage. We argue that is effectively, you know, reckless behavior. I mean, they knew or well should have known with real facts in front of them that this guidance wasn't good enough. And I think, if I may, may I continue? Yes. I think a point, a sticking point for everyone in this case is why would they do it? Why would he have done this? And I can't give you a motive that this court has said is enough to make a motive for an opportunity case. Aren't you supposed to supply evidence of scient? Yes, and we're doing it more through, you know, circumstantial evidence of conscious recklessness, but I do believe the lack of a motive is what drove the lower court to a large extent. You know, it pointed out that they had, their bonuses were tied to meeting that guidance. They had bought stock. And what I'd like to say to the court is, you've got to remember, Mr. Hayes had You mean, if they bought stock based on their expectations, they would have lost money. The company bought back stock. I'm sorry, I misspoke. I'm sorry. The company bought back stock, which would argue that they weren't lying. But I would argue that Mr. Hayes had just become the CFO in, I believe it was October or November. The company had been extremely successful under his predecessor. He did not want the very first thing out of his mouth, the first thing he does as the new CEO to be, oh, by the way, how great we're doing that, we're not doing it anymore. And I think that he consciously ignored that advice. As one of the analysts said at the end, you know, that he admitted, no, he'd hoped it would be, everything would be better. And hope is not a strategy. I would argue hope is conscious recklessness. Now, I've been well over, so I should probably, unless you have further questions, I will. Have I, have I tried, have I answered your question, Judge Hackson? You have responded to the question, yes. Answered. Yes, yes, you have answered the question, yes. Thank you, Mr. Jarvis. And you've reserved three minutes for rebuttal. And Mr. Savitt, we're going to add four minutes to your time if you feel free to use it. And we may even keep you up there longer than that, depending. Good morning. And may it please the Court, thank you for the additional time. My name is William Savitt from Wachtell, Lipton, Rosen, and Katz for the Defendant's App, please. Optimism, even misplaced corporate optimism, is not a core cause of action. It is not a basis to create an inference of fraud. Hope may not be a strategy. I don't know that.  And that is essentially what is alleged in this case. As this Court has repeatedly put the point, a plaintiff may not allege fraud by hindsight. That principle governs this appeal. Defendants here made good-faith projections. They cautioned in making them that they would be challenging to meet. They updated the market as sales came in below expectations. And they lowered the guidance promptly when it became clear on the basis of a half year of performance that they wouldn't be met. The complaint seeks to convert this sequence of events into a cause of action for fraud, claiming that Greg Hayes, UTC's Chief Executive Officer, was confessing judgment when in July 2015 he made self-critical observations in retrospect about the cause of the earnings miss. These allegations don't add up to fraud under any standard we submit, certainly not under the exacting pleading standards that control this case. The District Court's rulings can be affirmed on multiple related grounds. I'll address those substantive issues and also seek to address plaintiffs' objections regarding the District Court's proceeding. I was going to take the scienter issue first, Your Honors, because in a sense it provides the clearest lens to review the decision below. A PSLRA plaintiff has to allege particularized facts that create a strong inference of fraud. There are two ways to do that. Most commonly, a plaintiff tries to allege facts showing motive and opportunity to commit fraud. Plaintiff here does not even try to allege motive. There is none. There is none alleged. At the very end of his presentation, my friend Mr. Jarvis offered the supposition that there was a motive because Mr. Hayes had recently entered his position. That is unpleaded, and it does not stand logical reason either. It is not a basis for motive, and it deserves emphasis here. No motive at all is pleaded, and that leaves the plaintiff in the position of seeking to allege facts that evidence conscious misbehavior. That pleading standard is high. It allows a plaintiff to proceed only upon a showing of highly unreasonable conduct that represents an extreme departure from standards of ordinary care. Translated to ordinary English, the Sienter standard requires the complaint to plead hard actual facts that powerfully support the conclusion that the speaker intended to mislead the hearer. And the standard is even higher on this appeal. I say that because the statements being challenged are all forward-looking, as my friend has essentially conceded, meaning that the complaint must show that defendants actually knew that their statements were false. The standard is one of actual knowledge. So what facts are pleaded here to satisfy this pleading burden? Boiled down in December 2014, as the Court has heard, Hayes projected that UTC would target 3 to 6% EPS growth in 2015. That was way down over the preceding year already. It was way down from the 10% EPS growth the company had achieved the year before. That reduced target was based in part on the projection of high single-digit growth for commercial aftermarket sales in UTC's aerospace division, which is called UTAS. Hayes emphasized, as Mr. Jarvis recognized, that even this reduced growth would be challenging. The target, he said, appeared achievable but was going to be challenging. Then in early March 2015, UTC disclosed that UTAS aftermarket sales were weaker than expected and should be considered a watch item. So what you have here is the company vigilantly and promptly reporting weakness as it was happening in the marketplace. In June 2015, Mr. Gitlin, also a defendant, the guy who runs UTAS, disclosed bluntly, all of this is set out in the papers, that commercial aftermarket sales would not hit the projected high single-digit growth target. And in July 2015, as Mr. Jarvis discussed with the court at some length, UTC announced reduced projections. Let me say a word about what Mr. Hayes told the market in July 2015. He said that the change in the forecast reflected actual results for the half year that had just then ended. He explained that the company determined it wouldn't hit the projections after internal meetings that had just happened in the preceding days in which management digested the first half results. He explained further that orders anticipated in late June, always a big month for orders, hadn't materialized, which would make it not possible to hit the projected numbers. Hayes then added a self-critique, which became the centerpiece of plaintiff's complaint. And at the end of the day, Hayes said, it turned out there wasn't a strong basis for UTC's earlier belief in the strength of the UTAS aftermarket business. He observed that he pushed the teams to formulate plans to deliver strong growth that didn't pan out, given the business environment. I do want to say that he didn't say he pushed projections down. That's not what he said. He said, we pushed them. We pushed them because we thought we could get up to 300 million. And the truth is, 300 million wasn't what the projections said. It was a lower number than that, and it was a very substantial reduction over the year before. And Hayes went on to say that even though the company had estimated sales on a per-airline basis and adjusted its projections downward against previous years, he criticized himself for having not delved deep enough into the assumptions underlying the projections that were announced in December. That is, in essence, the story here, and there's nothing in it that adds up to fraud. Now, the lead argument that appears in plaintiff's papers and that was ventilated in Mr. Jarvis's discussion is that the July 21 statement of Mr. Hayes ought to be construed as an admission. Respectfully, we don't think that's a reasonable interpretation. As context makes clear, those were retrospective observations specifically made, as Hayes said, at the end of the day, specifically made only after the team reviewed the first-half results that caused the numbers to be taken down and after significant business expected hoped for at the end of June didn't materialize. Nothing in that supports the idea that this was essentially a confession to fraud six months earlier. Did the sale of Sikorsky have anything to do with this because that would have reduced the volume of sales pretty dramatically, and was that disclosed? Is that in this case? The Sikorsky issue is obliquely related, Judge Jacobs, to the case. Let me say how. In June at the Paris Air Show, UTC announced that it would be selling the Sikorsky business. As part of that, UTC took its earnings down, not because of the confirmation of softness in the commercial but because of the divestment of the Sikorsky business. And I should add, because I think it's germane, that months earlier UTC had taken its guidance down for other reasons, having to do with currency rate fluctuations and pension costs. And I emphasize all this because UTC, when it was clear that the numbers had to come down, took the numbers down. It did it twice even before it got to July, albeit for other reasons. Sikorsky was part of that story in that sense, Your Honor. But there's no issue that there were plans to sell Sikorsky and they weren't disclosed and therefore then the numbers dropped in a way that was surprising? I believe that's correct. I believe that's correct, Your Honor. As for plaintiff's assertion that UTC just assumed that future provisioning sales would be the same as past sales, that's just plainly wrong on the record before the court. The projections were derived from market trends. JA400 makes that clear. The projections for UTC were already significantly lower than in 2014, forecasting 10 percent growth down from 19 percent. Again, formulated on a per airline assessment of expected aftermarket purchases. Respectfully, with all of that in view, we don't think that the inference that the July 21st statements were a confession of knowing fraud makes sense as a reasonable one. I do want to say a word about the reliance of plaintiffs on confidential witnesses, first of all, and an overarching point. None of these former employees are ever alleged to have ever communicated any of their views to any defendant in any way, orally or in writing. Ever. Now, relying on one FE, FE6, plaintiff argues that a corporate team presented Mr. Gitlin a mid-single-digit growth forecast for UTAS some number of months before the December 14th projections were made. But as Judge Marrero observed, FE6 was two or three levels removed from Mr. Gitlin. The allegation thus reduces to the idea that this FE6 gave a forecast concerning a single small slice of UTAS's business to his boss, who presented that to his boss's boss during a meeting that FE6 didn't even attend, and that Gitlin reviewed the deck, realized that his own forecast expectations were wrong, but he went ahead and misled the market for no apparent reason. That's not a reasonable inference. And FE6 isn't even alleged to have ever spoken to Gitlin. These allegations here, again, don't clear any sort of bar, particularly the robust particularity bar as a matter of Second Circuit law. And on that point, even if you credit the allegation and we submit that one ought and for the reason we've said, as FE6 acknowledges, the commercial aftermarket projection continued to be refined for months after this alleged meeting with Gitlin. FE6 doesn't have a single allegation. Would you characterize FE1 through FE6 as a – would you characterize – it's a little unusual, I think, to see in a civil case like this people designated as though they're confidential informants. Can you – just for curiosity, can you explain to me why they're designated that way rather than by their names or some other way? It's striking. Your Honor, I'll do my best, but I need to say that in some sense Mr. Jarvis might be able to help you more because there are folks with whom he and his client have spoken and not – they are confidential and anonymous to us. Okay, they are. They are. We don't know – we only know who they are to the extent Your Honors do from what's been said out in the papers. And none of them, FE6 included, give any particularized allegations about how the projections were wrong. And it's also notable that the ultimate guidance wasn't even very different than what FE6 said the guidance should be. As to the other FEs, numbers 1 through 5, here again, none of them ever talked to any defendant. It's not alleged that any of them had visibility into anything other than a tiny slice of the business. And the allegations attributed to FE6, which anticipated growth for the aftermarket business, is entirely inconsistent with what plaintiff now wants to put in the mouths of its other FEs. And for those reasons, we don't think that the FE allegations ultimately can carry the day. A word quickly on the Tell Labs case, which we think summarizes and crystallizes the issue for this Court's consideration. That case says the PSLRI plaintiff may not proceed unless the inference of scienter is at least as compelling as any opposing inference of non-fraudulent intent. Plaintiff's theory here requires the Court to assume that Hayes and the other defendants purposely misled the market in 2014, that they intentionally lied about their projections knowing they were false, that they did that knowing those lies were going to cost them money because their pay was based on meeting their projections, not missing them. That over the course of the ensuing month, USTC said that the projections were a watch item, might not be made even though they were trying to sponsor what my friends call a deceit. And then in July 2015, Hayes just admitted the deceit, having achieved nothing by it. If that inference fails as a matter of common sense, why would anyone do it? It fails as a matter of law. This Court has held sensibly that corporate managers don't commit fraud for a short respite from an inevitable day of reckoning. Here's an alternative inferential chain. After a planning process that spanned months, UTC management perceived an achievable pathway to maintaining some of the growth that it had seen in the market in 2014, knowing that it would be challenging, disclosed exactly that to the market in December 2014. During the first half of the ensuing year, UTC warned the market of softness in those areas, that it was a watch item, took its guidance down twice, and that when the expected orders failed to materialize, management met together, realized the outlook was worse than expected, and promptly so advised the market. We submit that is the only compelling inference. It's the only plausible inference. It's not remotely a story of fraud. And that analysis governs the entirety of the case, because if the plaintiffs haven't sponsored an inferential theory that is at least as compelling as that one, their claim has to fail on the scienter pro. So let me ask you this, just shifting gears slightly to the procedural matter that brought this case here. Can you envision any argument that, and I will, of course, ask this of Mr. Jarvis, but he's on notice now, that would have been made to Judge Marrero that we haven't kicked around, or either in the briefs or orally here today? Your Honor, you ask a hard question, because you ask whether I can envision it. As I stand here today, I can't think of anything. I like to think, as a resourceful lawyer, I could come up with something if necessary. Here's, I think, the critical point. No such argument has been ventilated. No argument has been raised. There's been no indication of any prejudice from the procedure below. And if there were an argument worth making, and I would emphasize Judge Hong responding to you, I can envision an argument worth making that hasn't been made, and I say that because there have been 100 pages of briefing on this court in a matter that is predominantly, if not entirely, legal in character. And if there was an argument to be made, it should have been made, it would have been made, and it's waived if it wasn't. And for that reason, we are hard-pressed to see that there is any prejudice flowing from whatever the plaintiff may have to say about its objections to Judge Marrero's procedure below. If the Court has no further questions, we rest on our papers. We do want to emphasize that the Omnicare issue, as set out in our briefs, is an independent and, we think, compelling basis for dismissal. But if the Court has nothing further, we'll rest on our papers on that. Thank you, Mr. Savitt. Thank you. Mr. Jarvis. Thank you, Your Honor. I want to make a couple quick points and then get to maybe a little more substance. So quick points on tel-abs. It clearly holds that we don't have to have a motive. I tried to give one because I think that's something that sticks in your head, but it's not required. Do you mind raising the podium just a little so we're . . . There you go. I didn't press it hard enough. Sorry. Is that better? Yes. Thank you. So on tel-abs, no motive is required, and a tie goes to the plaintiff. So everything being equal, we win. And that sort of brings me to my next point on inferences. Mr. Savitt constantly wants, and Judge Marrero gave, inferences for the defendants. For example, there are two possible ways to read what Mr. Hayes said at the end. One is he's retrospectively musing, or two, maybe some of that, but he's also telling you facts about what the process was that they did in December and the period leading up to it. And you could read that, and that's just not retrospective musing. That's like, I was there. I'm telling you what happened. And I think that the court has to credit that. And the inferences all went to defendants. On FE-6, similarly, he was in the business development and planning group. Yes, he was a couple levels below the defendants, but he was one of the people who developed the projections. He says, I gave it to my boss, my boss gave it to Mr. Gitlin, that he would then have been aware what Mr. Gitlin got, because he was the guy who was responsible from his upper bosses. It's not an implausible inference. It's, in fact, an entirely plausible inference. He may not have been there personally, but that his superiors would have told him how his projections were received and that they, in fact, were made is not an impermissible inference. We didn't get it. Now, I'd like to switch gears just slightly, and then I'll end up on the procedural point raised by you. There's sort of two arguments here. One, we've been dealing with a lot, right, the initial projections back in December and what happened. But on June 15th at the Paris Air Show, when they mentioned first time Sikorsky and they did say some negative things, they also reaffirmed their guidance. They basically reaffirmed that the basic guidance for the company, and particularly for aerospace, because that was the Paris Air Show, was going to be continued. Then in July, about five weeks later, he admits, Mr. Hayes does, we could have taken it down in June. We could have reduced it then, but we wouldn't have reduced it enough. He says that. And this sort of falls in the first prong of Omnicare, i.e., it is false when made. He admits, five weeks later, we could have reduced it in June. We didn't because we wouldn't have reduced it enough. And what he says is, and this is what the district court credited, well, we were hoping some stuff would come in in the last two weeks in June, and it didn't come in, and so we wouldn't have taken it down enough. He never says, ever, that we wouldn't have taken it down at all, just that we wouldn't have taken it down enough. So they knew in June that they were going to have to reduce guidance, and they wanted to see by how much, but they didn't tell the market until July, oh, by the way, we could have reduced it in June. We didn't. Now we are. I'm out of time, but I would like to at least respond to the question that you presented to counsel. Please do. The question is, what could we have said before Judge Marrero that we have not presented to you? So I think you're sort of arguing no harm, no foul, right? Even though the procedures may not have been great, you know, no harm, no foul. It seems to me we're kicking around virtually every argument that could have been made to the district court, so I'd like you to tell me if you had a redo, what is it that you would ask the district court to consider that you're not asking us to consider because you haven't had that opportunity? What we would have done if we'd known, I think, that that was going to be our one shot is we would have probably spent more time in making . . . and we only had three pages, so there's only so much one can do. But in the first instance, the district court, as you know, we've argued, made all these inferences in favor of defendants against us. We would have tried to at least point out that we deserved all those inferences so that at the first instant . . . I mean, we're doing it here, but we would have done it there, and could that have changed? And I think the issue is not necessarily whether you judges will be able to see it all, but whether in the first instance we would have been able to convince Judge Marrero differently. I don't know that we would have, but we might well have. I mean, remember, they had a full 35-page brief and a three-page letter. They had 30 days on one, 20 days on the other. We had a week to prepare three pages, and then they got a rebuttal after that. And could we have made a case for inferences? I mean, given the imbalance, I doubt we could have. But if we had a full opportunity below, let's say they had a brief, we'd had a chance to respond, address in that brief every inference that they wanted to make in their favor, and say, no, Judge, you can't do this. We had a full and fair. Could we have convinced Judge Marrero differently? I don't know, but perhaps. What I'm wrestling with a little bit, Mr. Jarvis, is whether under the procedures, and your clients followed a procedure that was available to them by filing a new operative complaint. Whether it isn't a case, and I don't know the answer to this in my own head at this point, you pay your money and it takes your choice. You are talking about the inability to respond to the motion to dismiss and whether the motion opposition papers shouldn't have been filed at that time instead of the new complaint. I don't think it's a question, and I don't know the answer to that, but give me, I know what your views will be, but why don't you tell them. I don't think it's a case of take your money and pay your chances. I mean, you get a chance to see a motion to dismiss, try to repair what you can, and then argue to the district court judge that what you have repaired is sufficient. Plus, all of the other arguments that may have been raised that maybe you didn't repair, but you just want to make sure that they're put in the proper context. Why isn't the opportunity to file an amended complaint when you know, because it's been set out, all of the objections that have been interposed by your adversary, a better mechanism for defeating an adverse judgment than a 35-page brief? You can respond with allegations. You can blow up everything they're saying just by filing an amended complaint that cures any of the defects, if valid, that are being raised. And I think we believe that to the extent that we had the information that we could credibly allege, we did that. But this case— I understand, but that is the opportunity that you had. In some respects, it seems like a superior opportunity than generating additional briefs. May I respectfully disagree, Your Honor? Go ahead. I would argue that in a case like this where we're in the business, and particularly the district court judge is in the business, of drawing inferences from pled facts and determining whether those inferences, along with the pled facts, are sufficient to meet an exacting legal standard, that to do that without— I mean, one, I believe, cannot and should not make that sort of legal argument, and here's how you should deal with the inference in the cases, and here's how the case law of this circuit explains how the inference should be dealt with, is not the kind of thing one should do in a complaint. I think, you know, the concept of prolix pleading is much bandied about. Our complaints are grossly long sometimes, as it is given the requirements, and to then include into that sort of legal—say, okay, here's an inference. Oh, and by the way, under these six cases, you judge should credit this inference, which is essentially what we would do in a brief, is not the sort of thing we should do in a complaint. We should get the opportunity to explain to the court why those facts and the inferences reasonably drawn therefrom meet the exacting standard. Thank you very much. Thank you, Bob. We'll reserve decision in this case. Thank you.